WILLIAM WALLACE GREER, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EDWARD E. HALE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 30819, 31342.   Promulgated December 7, 1951.

*J. Benson Hoge, Esq.*, for the petitioners.
*William M. Fay, Esq.*, for the respondent.

## OPINION.

DISNEY, *Judge:* Although the partnership sold 127 pairs of chinchillas to the Canadians, under the later agreement all were returned except 74 pairs. Of these 74 pairs the respondent concedes that three pairs were from the original breeding herd and therefore that the gain from the sale of the three pairs is a capital gain; and the petitioners on their part concede, and from the facts we find, that 23 individual animals were less than six months old at the time of sale. Petitioners, therefore, concede that the 23 individual animals are not covered by their contention that the sale comes within section 117 (j) of the Internal Revenue Code. Thus, we see that only 119 animals are involved in this matter. The question as to that number is whether the sale resulted in ordinary income or capital gain within section 117, which is in necessary part set forth in the margin.[2]

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), * * *

* * * * * * * *

(j) * * *

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property

It appears now to be settled law that breeding animals, from a breeding herd, if they have been held for more than six months, are capital assets within section 117 (j), Internal Revenue Code, and that the profit from their sale is taxable as capital gain and not as ordinary income, *Albright* v. *United States*, 173 F. 2d 339; *United States* v. *Bennett*, 186 F. 2d 407; *Isaac Emerson*, 12 T. C. 875; *Fawn Lake Ranch Co.*, 12 T. C. 1139; *Franklin Flato*, 14 T. C. 1241. Therefore, as in *Walter S. Fox*, 16 T. C. 854, we have here a factual question as to whether the animals sold (and as to which neither party makes concession) were breeding animals or were, on the other hand, held primarily for sale to customers in the ordinary course of business. Under the *Bennett* and *Albright* cases, sales of breeding animals, from a breeding herd but not necessary thereto, are not sales of animals primarily held for sale to customers in ordinary course of business. We must decide therefore whether the animals here sold were breeding animals. The fact that the entire herd was sold to the Canadians does not demonstrate sale of capital assets. *Grace Bros., Inc.*, 10 T. C. 158, affd. 173 F. 2d 170.

The record before us is not as satisfactory as might be. It fails to include many of the details furnished in other cases on the same subject. For the petitioners, there is testimony to support the theory that the sales made throughout the years were only of such animals as were not essential to development of the breeding herd, contended to be intended eventually for pelting; but the respondent complains that this was only conclusion on the part of petitioners and that no evidence indicates standards to determine animals unfit for breeding purposes. The petitioners rely on the fact that such testimony on their part was uncontradicted. Contradiction need of course not lie in testimony, but may arise from other inconsistent evidence. We have, therefore, examined all evidence to ascertain, if possible, from the record whether all or any of the herd sold are properly to be considered breeding stock. It is apparent from the cases that if so, even if they are "culls," their sale results in capital gain rather than ordinary income.

The record before us discloses purchase in 1941 of a breeding herd of ten pairs of chinchillas, with the purpose of developing a herd, one sale, in an early year, of 30 or 40 pelts, the destruction or devotion to cancer research of some unfit animals, the sale of chinchillas, after considerable advertising and payment of commissions, each year after

used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *

1942, totaling about 93 pairs, up to October 1, 1946, including about 55 pairs sold in 1946; and finally the sale of the remaining 127 pairs on October 1, 1946, of which only 74 pairs were actually taken, since 53 pairs were by agreement returned to ownership of the partnership.

After analysis of all the evidence here, we have come to the conclusion that most but not all of the 74 pairs of chinchillas sold to the Canadians were breeding stock and therefore sale resulted in capital gain and not ordinary income. Though we are conscious that much of the testimony for the petitioners is not as well substantiated by other evidence as might be desired, and though there are many facts indicating more or less current sales of chinchillas, in and after 1942, and although only a few of the animals involved were definitely indicated on the partnership records as not to be sold, we are convinced from the evidence as a whole that the partnership had an objective of building up a herd of about 200 pairs of chinchillas for the primary purpose of eventually selling the pelts. The partnership registered a trade name not for the chinchillas but for the fur, and we think from all of the facts before us that the profit for which the partners hoped was from sale of fur rather than chinchillas. It is true that they sold a considerable number, after the first 2 years, and advertised and paid commissions for sales, but the question here for determination is essentially: What was the primary purpose; and we think such primary purpose lay in the ultimate sale of fur, rather than the sale of animals. Under the evidence, only animals, in effect, which were considered unnecessary or unfit for the development of the breeding herd were sold. Finances were needed and in comparison with the number of chinchillas sold on October 1, 1946, a large number were sold prior to that date. Nevertheless, the fact of such sales does not overcome, we think, the fact that the larger and final purpose was the development of a valuable herd, and if the sale here involved was of breeding animals, the result is capital gain. The respondent stresses the petitioners' failure to set any definite standard of differentiation between breeding stock and other animals, and it is true that the petitioners suggest no standard other than the experience of the partnership. In the case of the chinchillas here involved, and the purpose of developing fine fur, we have concluded that reliance on such experience and the lack of clearer definition of what was considered breeding stock and what was not and therefore could be sold, is not fatal to the petitioners' contention. As we understand the situation as to chinchillas, shown in this case, the sole test of fitness, and of the desired result, was fine fur and the animals producing the best fur were those which it was desired to propagate. The matter was one of "line breeding" which we think reasonably connotes the perpetuation of the lineage of an animal which produced fur of the

desired quality; and since the almost fabulous value of chinchilla fur makes it obvious that the fur and not the animal in any other respect is the desired object of any one interested in them, there appears ample reason for the sale, even in comparatively large numbers, of chinchillas which, though breeding animals, do not tend to produce a line which will bear fur of the fineness desired by the particular operator. Such animals would be "culls" within the meaning of the *Albright* case, *supra*, even though they might bring a high price from someone satisfied to produce a fur of lesser fineness than the seller desired. Under all of the evidence before us, we have concluded that the sales made, prior to October 1, 1946, represented such culling from a breeding herd and do not demonstrate that the primary purpose was the mere production of animals for sale in the ordinary course of business. It is clear that at the end of 5 years the petitioners had sold only 93 pairs (aside from 30 to 40 pelts and some animals killed or given to cancer research) as against 127 pairs still on hand, which tends to indicate in our opinion the soundness of the theory that the eventual object was to breed a larger herd. We conclude that in the main the animals sold were not primarily held for sale to customers in the ordinary course of business.

This does not mean, however, that all of the 74 pairs not returned to the petitioners were shown to be in that category. To be so placed they must under the *Albright* and *Bennett* cases be breeding animals. Even the general test of experience of the petitioners required time and observation. Under the evidence, though the previous sales left the partnership in general with breeding stock which was sold to the Canadians, examination of the facts discloses that (in addition to the 23 animals petitioners concede were not six months of age) some animals included in the sale of October 1, 1946, and not returned, do not meet the test of being breeding stock. It is obvious, we think, even from the manner in which the partnership operated the chinchilla herd, that some animals were breeding animals, and some were not. The amount of sales before October 1, 1946, with no claim, previous to this case, that they were of capital assets, and the marking of only 17 animals as "never sell," shows that the partnership did not then consider its whole herd as composed of breeding animals. Not only, as above seen, does the sale on October 1, 1946, of the herd as a whole not demonstrate that all were breeding animals, but taken with the previous treatment of the matter by the partnership, tends to indicate that some animals therein, at least, were not breeders. Here there was not, as in some cases, segregation of the breeding stock from others; and the petitioners fail to furnish criteria for distinguishing breeding stock from the remainder. Under such circumstances, convinced that all animals sold were not breeders, we must arrive at the best classification possible under the evidence. In *Walter S. Fox, supra*, and fol-

lowing it in *James M. MacDonald*, 17 T. C. 210, in cases involving cattle we excepted from the breeding herd, otherwise found, young female animals of less than 26 months that had not produced and males of less than 34 months, and of unproven breeding qualities, on the theory that they were not yet breeding animals. In this case the evidence indicates that ordinarily chinchillas are about a year of age before producing litters, also that 58 animals had not produced before October 1, 1946, among which 13 pairs and one animal had not even been mated on October 1, 1946, and one pair was never mated, according to the partnership records. The 58 animals included the 23 less than six months of age, also included seven others less than one year of age at that date. In our view, the 58 animals can not soundly be said to be breeding animals. They had not proved themselves as breeders, and might, under the evidence, be eliminated before they ever did so. To sustain petitioners' contention they must be *"used* in the trade or business" (emphasis added) and they can not realistically be so regarded. We hold that 58 animals were not shown to be breeding animals and that the remaining 90 animals were breeding animals and capital assets, the sale of which resulted in capital gain, while that from the 58 animals was ordinary income.

*Decisions will be entered under Rule 50.*