HERBERT A. NIEMAN & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56932. Filed December 9, 1959.

*Harvey W. Peters, Esq.*, and *William A. Jackson, Esq.*, for the petitioner.

*Erving Sodos, Esq.*, for the respondent.

#### OPINION.

VAN FOSSAN, *Judge:* The respondent determined deficiencies in petitioner's income tax for the year 1941, declared value excess-profits tax for the year 1942, and excess profits tax for the years 1942 through 1945, as follows:

| Year | Tax | Deficiency |
|------|-----|-----------|
| 1941 | Income | $25,640.55 |
| 1942 | Declared value excess-profits | 1,872.58 |
| 1942 | Excess profits | 15,445.11 |
| 1943 | Excess profits | 20,649.07 |
| 1944 | Excess profits | 77,690.61 |
| 1945 | Excess profits | 39,764.39 |

The petitioner timely claimed overpayment in income tax for the years 1941 and 1945, and in excess profits tax for the years 1941 through 1945, as follows:

| Year | Tax | Claimed overpayment |
|------|-----|---------------------|
| 1941 | Income | $4,102.97 |
| 1941 | Excess profits | 72,604.62 |
| 1942 | Excess profits | 277,770.70 |
| 1943 | Excess profits | 357,689.14 |
| 1944 | Excess profits | 104,905.75 |
| 1945 | Income | 2,808.25 |
| 1945 | Excess profits | 234,786.51 |

Several matters, including, *inter alia*, questions of interest expense, inventory cost, and a net operating loss carryback, have been resolved by stipulation of the parties. The stipulation will be given effect under Rule 50. There remain for our consideration the following issues: First, whether amounts received by petitioner upon the sale of pelts taken from breeder foxes qualify for treatment under the provisions of section 117(j) of the Internal Revenue Code of 1939; second, whether petitioner is entitled to deductions for depreciation upon breeder foxes on hand during each of the years 1942 through 1945; and third, whether the dissolution of Ozaukee Fur Farms Company, of which petitioner was the principal stockholder, resulted in a loss deductible by petitioner in 1941.

All of the facts are stipulated, the stipulation being incorporated herein by this reference.

The petitioner is a Wisconsin corporation with its principal office at Thiensville, Wisconsin.

For the years 1941 through 1947 it filed corporate income tax returns with the collector of internal revenue at Milwaukee, Wisconsin. For the years 1940, 1941, 1942, 1943, 1944, and 1945 it filed corporate excess profits tax returns with the collector of internal revenue at Milwaukee, Wisconsin. The petitioner reports its income and files its corporate income and excess profits tax returns on a calendar year accrual basis.

During the taxable years here involved, petitioner was engaged, *inter alia*, in the fur fox-ranching or -farming business. In the process of conducting its fur fox-ranching or -farming business all foxes were identified by means of a serial number assigned to each fox at the time of its birth. The pelt obtained from each fox was identified by means of assigning it a seal number at the time the fox was killed and pelted. The serial and seal numbers were cross-indexed by petitioner so that it could identify a fox from the date of its birth to the date of sale of its pelt.

In the ordinary course of its business petitioner designated certain of its foxes as breeders, hereinafter referred to as breeder foxes. These breeders were kept in pens in the Thiensville, Wisconsin, area and were bred to produce annual crops of foxes. At appropriate times, during the latter part of the year, these foxes (the annual crop) which had been raised at Thiensville, Wisconsin, were, with the exception of those designated as breeder foxes, transported to a furring range in northern Michigan for the purpose of priming their pelts and then pelting them. In addition, certain of the breeder foxes which were replaced by the newly designated breeders were likewise transported in the latter part of the year to the same furring range in northern Michigan for the purpose of priming their pelts and then pelting them. Hereinafter, "breeder pelts" is the term used to refer to pelts obtained from breeder foxes.

The breeder foxes were used for varying periods of time. The number of breeder foxes as of December 31 of each of the taxable years here involved, the unit cost of production, the total cost of breeders, and the year in which each of these foxes was born, are shown by the following schedule:

454

| Breeders' year of birth | Dec. 31, 1941 | | | Dec. 31, 1942 | | | Dec. 31, 1943 | | | Dec. 31, 1944 | | | Dec. 31, 1945 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number on hand | Unit cost of production | Amount | Number on hand | Unit cost of production | Amount | Number on hand | Unit cost of production | Amount | Number on hand | Unit cost of production | Amount | Number on hand | Unit cost of production | Amount |
| 1935 | 2 | $25.95 | $51.90 | | | | | | | | | | | | |
| 1936 | 20 | 28.38 | 567.60 | 6 | $28.38 | $170.28 | | | | | | | | | |
| 1937 | 225 | 22.29 | 5,015.25 | 43 | 22.29 | 958.47 | 6 | $22.29 | $133.74 | | | | | | |
| 1938 | 780 | 21.36 | 16,660.80 | 248 | 21.36 | 5,297.28 | 58 | 21.36 | 1,238.88 | 2 | $22.29 | $44.58 | | | |
| 1939 | 1,414 | 20.03 | 28,322.42 | 771 | 20.03 | 15,443.13 | 316 | 20.03 | 6,329.48 | 83 | 20.03 | 1,662.49 | 6 | $20.03 | $120.18 |
| 1940 | 2,408 | 17.48 | 42,091.84 | 1,623 | 17.48 | 28,370.04 | 890 | 17.48 | 15,557.20 | 350 | 17.48 | 6,118.00 | 77 | 17.48 | 1,345.96 |
| 1941 | 3,178 | 16.75 | 53,231.50 | 2,103 | 16.75 | 35,225.25 | 1,302 | 16.75 | 21,808.50 | 708 | 16.75 | 11,859.00 | 249 | 16.75 | 4,170.75 |
| 1942 | | | | 3,245 | 17.22 | 55,878.90 | 2,019 | 17.22 | 34,767.18 | 1,403 | 17.22 | 24,159.66 | 743 | 17.22 | 12,794.46 |
| 1943 | | | | | | | 3,451 | 24.64 | 85,032.64 | 2,240 | 24.64 | 55,193.60 | 1,414 | 24.64 | 34,840.96 |
| 1944 | | | | | | | | | | 3,265 | 20.81 | 67,944.65 | 2,034 | 20.81 | 42,327.54 |
| 1945 | | | | | | | | | | | | | 3,564 | 22.47 | 80,083.08 |
| Total | 8,027 | | 145,941.31 | 8,039 | | 141,343.35 | 8,042 | | 164,867.62 | 8,051 | | 166,981.98 | 8,087 | | 175,682.93 |

NOTE: Taxpayer used as the unit cost of all foxes, including breeder foxes, the unit cost determined by dividing total production costs of the year of birth by the total number of foxes raised in the particular year.

On the balance sheets accompanying its Federal income and declared value excess-profits tax returns for each of the calendar years 1941 through 1945 petitioner included under the heading "Inventories" a valuation for "Breeding Foxes & Other Foxes" as of the beginning and end of each of the taxable years, as follows:

| Year | Beginning of taxable year | End of taxable year |
|---|---|---|
| 1941 | $149,207.74 | $145,881.31 |
| 1942 | 145,881.31 | 141,343.35 |
| 1943 | 141,343.35 | 164,867.62 |
| 1944 | 164,867.62 | 166,981.98 |
| 1945 | 166,981.98 | 175,682.93 |

No deduction for depreciation of breeder foxes was claimed on any of the above returns, and no depreciation allowance with respect to breeder foxes was allowed by the respondent as a deduction in determining petitioner's taxable income and petitioner's income and excess profits tax liability, for any of the taxable years here involved.

Among the pelts sold by the petitioner during the calendar years 1942 to 1945, inclusive, were pelts taken from breeder foxes which had been held in the breeding herd for more than 6 months, in the following quantities and gross sales amounts:

| Year | Number sold | Gross sales |
|---|---|---|
| 1942 | 2,989 | $81,963.07 |
| 1943 | 2,715 | 93,517.39 |
| 1944 | 2,981 | 133,131.46 |
| 1945 | 3,166 | 120,409.00 |

The above amounts were included in the gross income of petitioner as ordinary taxable income in Federal income and excess profits tax returns filed by petitioner, and in respondent's determination of petitioner's income and excess profits tax liability for the respective years no adjustment of petitioner's method of reporting was made.

Petitioner incurred the following sales commissions and expense in connection with the sale of breeder fox pelts in the years 1942 to 1945, inclusive:

| Year | Amount |
|---|---|
| 1942 | $4,868.71 |
| 1943 | 5,273.11 |
| 1944 | 4,659.60 |
| 1945 | 4,214.31 |

The original cost of the breeder foxes, the pelts of which were sold in the years 1942 to 1945, inclusive, and the number sold by year of birth, were as follows:

Year ended Dec. 31—

| Breeders' year of birth | 1942 | | | 1943 | | | 1944 | | | 1945 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number sold | Unit cost of production | Cost amount | Number sold | Unit cost of production | Cost amount | Number sold | Unit cost of production | Cost amount | Number sold | Unit cost of production | Cost amount |
| 1934 | 3 | $26.73 | $80.19 | | | | | | | | | |
| 1935 | 8 | 25.95 | 207.60 | 2 | $25.95 | $51.90 | | | | | | |
| 1936 | 137 | 28.38 | 3,888.06 | 12 | 28.38 | 340.56 | 4 | $28.38 | $113.52 | | | |
| 1937 | 12 | 30.00 | 360.00 | | | | | | | | | |
| 1937 ¹ | 420 | 22.29 | 9,361.80 | 149 | 22.29 | 3,321.21 | 15 | 22.29 | 334.35 | 3 | $22.29 | $66.87 |
| 1938 | 6 | 30.00 | 180.00 | | | | | | | | | |
| 1939 | 660 | 21.36 | 14,097.60 | 437 | 21.36 | 9,334.32 | 118 | 21.36 | 2,520.48 | 57 | 21.36 | 1,217.52 |
| 1940 | 590 | 20.03 | 11,817.70 | 534 | 20.03 | 10,696.02 | 327 | 20.03 | 6,549.81 | 217 | 20.03 | 4,346.51 |
| 1941 | 1,036 | 17.48 | 18,109.28 | 675 | 17.48 | 11,799.00 | 734 | 17.48 | 12,830.32 | 529 | 17.48 | 9,246.92 |
| 1942 | 117 | 16.75 | 1,959.75 | 898 | 16.75 | 15,041.50 | 553 | 16.75 | 9,262.75 | 578 | 16.75 | 9,681.50 |
| 1943 | | | | 8 | 17.22 | 137.76 | 1,225 | 17.22 | 21,094.50 | 597 | 17.22 | 10,280.34 |
| 1944 | | | | | | | 5 | 24.64 | 123.20 | 1,178 | 24.64 | 29,025.92 |
| 1945 | | | | | | | | | | 7 | 20.81 | 145.67 |
| Total | 2,989 | | 60,061.98 | 2,715 | | 50,722.27 | 2,981 | | 52,828.93 | 3,166 | | 64,011.25 |

¹ Purchased

The original cost of the breeder foxes, the pelts of which were sold in the years 1942 to 1945, inclusive, and the sales commissions and expense incurred in connection with the sale of these pelts, were deducted from the gross income of the petitioner as deductions reducing petitioner's ordinary taxable income on Federal income and excess profits tax returns filed. No adjustment of petitioner's method of reporting was made regarding this matter in respondent's determination of petitioner's income and excess profits tax liability for the respective years.

Ozaukee Fur Farms Company, hereinafter referred to as Ozaukee, was issued a certificate as a corporation under the laws of Wisconsin on June 18, 1923.

The articles of incorporation of Ozaukee provided that the corporation's business was—

to establish, own and operate a fox farm or farms for the purpose of breeding, raising, buying and selling silver black foxes and other fur bearing animals; to grow and sell ginseng, and engage in general farming; to purchase, lease, hold, mortgage and sell any real estate; and perform all other acts which may be incidental to and proper in carrying on said business.

The first meeting of the incorporators and subscribers of stock was held on December 1, 1923.

Ozaukee's capital on incorporation was 2,000 shares of a par value of $100 for a total capital of $200,000, and petitioner's books of account report $150,000 of the original capital was represented by breeder foxes and $50,000 of other assets.

Ozaukee's capital stock was originally held by some 29 stockholders. By July 21, 1933, the stock was held as follows:

| Stockholder | Shares |
|---|---|
| Herbert A. Nieman & Co. | 1,991 |
| John F. Nieman | 5 |
| Herbert A. Nieman | 1 |
| A. H. Carthaus, M.D. | 1 |
| Chas. J. Nieman | 1 |
| Wm. F. Schultz | 1 |
| Total | 2,000 |

On January 2, 1934, Ozaukee sold all of its real estate and personal property other than cash at the net depreciated book value of $99,449.96.

Ozaukee made the following cash distributions in the year 1934 from its surplus account:

| | |
|---|---|
| Mar. 3, 1934___Dividend of $50 per share | $100,000 |
| June 19, 1934___Dividend of $2.65 per share | 5,298 |
| Dec. 29, 1934___Dividend of $50 per share | 100,000 |
| Total | 205,298 |

The sale of its operating assets by Ozaukee to petitioner created a $99,449.96 note receivable due from petitioner.

The notes receivable balance of $99,449.96 increased further, so that on April 4, 1941, the total amount due Ozaukee by petitioner was $250,189.06.

Ozaukee adopted a resolution of dissolution on February 25, 1941, which was filed with the secretary of state of the State of Wisconsin on March 4, 1941. On March 10, 1941, it filed a copy of its resolution of dissolution along with the certificate of dissolution issued by the secretary of state.

Respondent, by 30-day letter dated May 7, 1941, determined that Ozaukee was taxable as a personal holding company under internal revenue laws for the years 1935 to 1940, inclusive, and made a determination that there was a personal holding company surtax liability of $27,215.28, plus delinquency penalties of $5,580. This determination was contested.

The petitioner purchased the 9 shares of Ozaukee stock owned by individuals on August 6, 1941, for the sum of $1,130.94, and thereafter owned the entire 2,000 shares of Ozaukee capital stock outstanding.

As of December 31, 1941, the books of account of Ozaukee show the following cost basis of its assets:

| | |
|---|---:|
| Notes receivable | $244,284.86 |
| Cash | 7,433.78 |

These assets were subject to claim by creditors for the following items:

| | |
|---|---:|
| Accrued 1941 Wisconsin income tax | $49.98 |
| Accrued 1941 Federal income tax | 1,714.22 |
| Determination of respondent of a deficiency in personal holding company surtax (pursuant to 30-day letter dated May 7, 1941) | 27,215.28 |
| Determination of respondent of delinquency penalties (pursuant to 30-day letter dated May 7, 1941) | 5,580.00 |

On December 31, 1941, Ozaukee canceled and delivered to petitioner the latter's note payable, retaining only cash in bank in the amount of $7,433.78. Ozaukee treated $15,000 of the canceled note as a 1941 distribution to petitioner. At the time Ozaukee canceled the note, petitioner had an adjusted cost basis in its 100 per cent holding of Ozaukee's capital stock totaling $310,676.36.

On its Federal income and declared value excess-profits tax return for the calendar year 1941, petitioner reported a loss on its investment in Ozaukee, computed as follows:

Distribution (cancellation of petitioner's note payable)_____$244,284.86
Less amount reported as dividend_____ 15,000.00

                                                                  229,284.86
Total cost (of Ozaukee stock)_____ 310,676.36

   Loss _____ (81,391.50)

In early 1942 Ozaukee paid its 1941 Wisconsin income and Federal income tax liabilities totaling $1,764.20, retaining a cash balance of $5,669.52.

By its letter dated August 4, 1942, the technical staff of the then Bureau of Internal Revenue approved a settlement offer that had been made by Ozaukee on its controverted personal holding company surtax liability for the years 1935 through 1940. On June 26, 1942, Ozaukee paid the following amounts:

Personal holding company surtax_____$14,930.45
Penalties on personal holding company surtax_____ 3,732.62
Interest due on personal holding company surtax_____ 1,608.92
Income tax overassessment ($7.50)_____ (7.50)
Interest thereon _____ 5.33

   Total _____ 20,269.82

Ozaukee applied its entire cash balance of $5,669.52 in payment of the personal holding company surtax and interest, and petitioner advanced to Ozaukee the net amount of $14,596.43. This advance to pay the assessed personal holding company surtax liability was not claimed as a loss or other form of deduction in 1942, but remained on the books of petitioner until 1950, at which time it was written off to surplus without any claim of deduction from net income reported on petitioner's income tax returns.

The first question is whether amounts received by petitioner upon the sale of pelts taken from foxes held for breeding purposes qualify for treatment under the provisions of section 117(j) of the Internal Revenue Code of 1939.

Section 117(j) allows capital gains treatment upon the sale, exchange, or conversion of livestock, regardless of age, held for draft, breeding, or dairy purposes and held for 12 months or more from the date of acquisition.[1]

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.
.(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—
   (1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand

Petitioner was engaged, *inter alia*, in fur fox ranching. In the ordinary course of its business petitioner designated certain of its foxes as breeders. These breeders were kept, for varying periods of time, in pens in Thiensville, Wisconsin, and were bred to produce annual crops of foxes. During the latter part of the year the annual crop of foxes, with the exception of those designated as breeders, were transported to a furring range in northern Michigan for the purpose of priming and taking their pelts. In addition, certain of the breeder foxes, which were replaced by newly designated breeders, were also transported to northern Michigan for the purpose of priming and taking their pelts. It is these breeder foxes with which we are here concerned.

Petitioner contends that the breeder foxes were section 117(j) assets and that therefore the pelts of the animals should also qualify for 117(j) treatment, being the only salable property element remaining after service of the animal as a breeder and the only property element representing the unrecovered income tax basis of the animal after cessation of its use as a breeder.

Respondent admits that the breeder foxes were section 117(j) assets entitled to capital gains treatment, if sold, but contends that petitioner, by removing the animals from the breeder group and priming and taking their pelts, converted the purpose for which they were held from that of use in the business to that of sale to customers in the ordinary course of business. Respondent, therefore, concludes that the pelts obtained from these breeder foxes cannot be regarded as 117(j) assets.

This precise question has recently been answered by this Court in *Ben Edwards*, 32 T.C. 751, and by the Court of Appeals for the Eighth Circuit in *United States* v. *Cook*, 270 F. 2d 725, affirming *Cook* v. *United States*, 165 F. Supp. 212 (D. Minn., 1958). Both cases held that the taxpayers were entitled to capital gains treatment of the proceeds from the sale of pelts taken from mink held for breed-

---

at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k)(1) or (2) is applicable. Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition.

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

ing purposes. In so holding, both courts declined to follow Rev. Rul. 57–548, 1957–2 C.B. 54. Respondent has advanced no argument here that convinces us the above-cited decisions were in error. Accordingly, we regard them as controlling. As pointed out in *Cook, supra,* and *Edwards, supra, Kahua Ranch* v. *United States,* 165 F. Supp. 210 (D. Hawaii, 1956), relied upon by respondent, is distinguishable on the facts.

The second question is whether petitioner is entitled to deductions for depreciation upon breeder foxes on hand during each of the years 1942 through 1945.

Petitioner contends that it is entitled to deduct a reasonable allowance for depreciation of the cost basis of its breeder foxes, under the provisions of section 23(1) of the Internal Revenue Code of 1939.[2]

In the statement attached to the notice of deficiency respondent determined that the value of the foxes was taken into inventories used in computing the gross profits reported on petitioner's returns and that the animals were, therefore, not subject to depreciation. Respondent now asserts that even if depreciation is permissible, salvage value must be used in computing the amount of the depreciation deductions.

The record contains nothing which shows respondent's determination to be in error.

On the balance sheets accompanying its Federal income and declared value excess-profits tax returns for each of the calendar years 1941 through 1945 petitioner included, under the heading "Inventories," a valuation for "Breeding Foxes & Other Foxes" as of the beginning and end of each of the taxable years. No deduction for depreciation of breeder foxes was claimed on any of these returns. With the exception of minor discrepancies, the inventory value assigned to the foxes was the cost of the breeder foxes on hand. There is no evidence that petitioner ever requested permission to change its method of accounting. See Regs. 111, secs. 29.22(c)–6 and 29.41–2.

Petitioner contends that the application of the term "Inventories" to its breeder foxes is, for income tax purposes, a misnomer. We do not agree.

Regulations 111, section 29.22(a)–7, give farmers reporting income on the accrual basis the option of treating their breeding stock as "capital assets subject to depreciation" or of including such stock in inventory. If, however, the breeding stock is included in inven-

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, &ast; &ast; &ast;

tory, Regulations 111, section 29.23(1)–10, prohibit the taking of a deduction for depreciation on the animals.[3]

During each of the years here in issue petitioner, reporting on an accrual basis, included the value of its breeder foxes on its balance sheet under the term "Inventories." It did not claim a deduction for depreciation on the foxes during any of these years. In view of the regulations it must be concluded that the petitioner elected not to capitalize the breeder foxes but to include them in inventories and forego depreciation deductions. *Elsie SoRelle*, 22 T.C. 459 (1954). We accordingly hold petitioner not to be entitled to deductions for depreciation on breeder foxes for any of the years 1942 through 1945.

This holding does not affect our determination, above, that petitioner was entitled to capital gains treatment of the proceeds from the sale of breeder fox pelts under section 117(j) of the Internal Revenue Code of 1939. *Fawn Lake Ranch Co.*, 12 T.C. 1139 (1949); *Elsie SoRelle, supra.*

We find it unnecessary to decide whether or not the salvage value of the breeder foxes should be taken into consideration.

The parties have further stipulated that if the Court should determine that the gains from the sale of breeder pelts are to be treated under section 117(j), then petitioner should be held to have incurred losses on the death of breeder foxes or from breeder foxes lost on the fur ranges without realization of pelts during the years 1942 through 1945 in the respective amounts of $4,226.93, $8,096.51, $2,103.55, and $3,623.02. We so hold.

The next question is whether or not the dissolution of Ozaukee resulted in a loss deductible by petitioner in 1941.

On its Federal income and declared value excess-profits tax return for the calendar year 1941 petitioner claimed a loss on its investment in Ozaukee in the amount of $81,391.50.

Respondent contends that the loss arose out of the liquidation of Ozaukee in 1941 and therefore, pursuant to section 112(b)(6) of the Internal Revenue Code of 1939,[4] is not recognizable for income tax purposes.

---

[3] SEC. 29.23(1)–10. DEPRECIATION IN CASE OF FARMERS.— * * * A reasonable allowance for depreciation may also be claimed on livestock acquired for work, breeding, or dairy purposes, unless they are included in an inventory used to determine profits in accordance with section 29.22(a)–7. Such depreciation should be based on the cost or other basis and the estimated life of the livestock. If such livestock be included in an inventory no depreciation thereof will be allowed, as the corresponding reduction in their value will be reflected in the inventory. * * *

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

* * * * * * *

(6) PROPERTY RECEIVED BY CORPORATION ON COMPLETE LIQUIDATION OF ANOTHER.—No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if—

Petitioner admits, on brief, that Ozaukee was completely liquidated, but asserts that the liquidation began in 1934, and that in accord with section 112(b)(6)(B) (relating to liquidations beginning prior to January 1, 1936) the nonrecognition provisions of section 112(b)(6) do not apply.

We are of the opinion that respondent's position is correct and that the loss is not recognizable.

It has often been said that liquidation is a question of fact. *John Milton*, 33 B.T.A. 4, 8 (1935). As of July 21, 1933, petitioner owned 1,991 shares of the 2,000 shares of Ozaukee stock. On January 2, 1934, Ozaukee sold all of its real and personal property, other than cash, to petitioner in exchange for a note in the amount of $99,449.96. During 1934 Ozaukee made three cash distributions, aggregating $205,298, from its surplus account. There was in 1934 no evidence of a formal resolution or plan of liquidation.

Petitioner contends that these events signaled the beginning of the liquidation of Ozaukee which was ultimately accomplished in later years. Taken alone, they might be said to be indicative of a liquidation. A plan of liquidation and an intent to liquidate might possibly be inferred from the events themselves. *Horn & Hardart Baking Co.* v. *United States*, 34 F. Supp. 89 (E.D. Pa., 1940). However, the inferences from these facts are not conclusive—the full facts control the inference. *C. M. Menzies, Inc.*, 34 B.T.A. 163, 168 (1936), citing *Doyle* v. *Mitchell Brothers Co.*, 247 U.S. 179 (1918), and *Weiss* v. *Wiener*, 279 U.S. 333 (1929). The events of 1934 must be placed in context with subsequent developments.

---

(A) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 per centum of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), and was at no time on or after the date of the adoption of the plan of liquidation and until the receipt of the property the owner of a greater percentage of any class of stock than the percentage of such class owned at the time of the receipt of the property; and

(B) no distribution under the liquidation was made before the first day of the first taxable year of the corporation beginning after December 31, 1935; and either

(C) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock, shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; or

(D) such distribution is one of a series of distributions by such other corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of all the property under the liquidation is to be completed within three years from the close of the taxable year during which is made the first of the series of distributions under the plan, except that if such transfer is not completed within such period, or if the taxpayer does not continue qualified under subparagraph (A) until the completion of such transfer, no distribution under the plan shall be considered a distribution in complete liquidation.

It is alleged in the petition and admitted in respondent's answer that Ozaukee remained in existence until 1941, loaned funds, and had interest income. Ozaukee's notes receivable balance increased during the period 1934 to 1941 so that by April 4, 1941, the total amount due Ozaukee by petitioner was $250,189.06. By 30-day letter dated May 7, 1941, respondent determined Ozaukee to be taxable as a personal holding company for the years 1935 to 1940. This determination was contested and was finally settled in 1942 by petitioner's payment of personal holding company surtax, penalties, and interest in the amount of $20,269.82. Ozaukee adopted a resolution of dissolution on February 25, 1941. On August 6, 1941, petitioner purchased the remaining shares of Ozaukee stock owned by individuals, and on December 31, 1941, Ozaukee canceled petitioner's note payable, retaining only cash in bank in the amount of $7,433.78. The cash retained by Ozaukee was not sufficient to meet all its obligations, and in 1942 petitioner advanced funds to Ozaukee to enable it to pay its assessed personal holding company surtax liability. The above events are persuasive that Ozaukee remained a going concern until 1941.

A status of liquidation exists only where the activities of the corporation are for the purpose of winding up its affairs. *W. E. Guild*, 19 B.T.A. 1186, 1203 (1930). There must be a manifest intention to liquidate and a continuing purpose to terminate the corporate affairs and dissolve the corporation; and its activities must be confined to those objectives. *T. T. Word Supply Co.*, 41 B.T.A. 965, 980 (1940); *W. E. Guild, supra.*

There is no evidence of any activities during the long interim between 1934 and 1941 which can be construed as evincing a continuing purpose to terminate Ozaukee, or as directed toward winding up its affairs. To the contrary, the evidence points to the conclusion that the corporation was regarded as a continuing venture.

The absence of any efforts to further the liquidation of Ozaukee during the more than 6-year period between 1934 and 1941, coupled with the continued activities of the corporation, effectively negatives any inference of intent to liquidate which might otherwise be drawn from the sale of assets and distribution of dividends in 1934. We must conclude that petitioner has failed to show that the liquidation began before January 1, 1936, and that consequently the nonrecognition provisions of section 112(b)(6) apply.

The fact that it has not been shown that the stock of Ozaukee was canceled is no obstacle to our conclusion. *Frelmort Realty Corporation*, 29 B.T.A. 181, 189 (1933).

Petitioner does not seriously argue that Ozaukee was still in the process of liquidation in 1942. As of December 31, 1941, Ozaukee had distributed all its assets other than a small amount of cash, which cash was insufficient to meet its liabilities.

On its Federal income and declared value excess-profits tax return for the calendar year 1941 petitioner treated $15,000 of the $244,-284.86 note canceled by Ozaukee, as a taxable dividend. Ozaukee was in the process of liquidation, pursuant to the resolution of dissolution adopted on February 25, 1941. On December 31, 1941, Ozaukee canceled and returned petitioner's note payable. Petitioner may not arbitrarily label a $15,000 portion of the canceled note as an ordinary dividend. The $15,000 sum was part of the distribution in liquidation and should not have been reported as a taxable dividend. *Robert Gage Coal Co.*, 2 T.C. 488 (1943); *Texas-Empire Pipe Line Co.*, 42 B.T.A. 368, 376 (1940), affirmed as to this point 127 F. 2d 220 (C.A. 10, 1942); *Canal-Commercial T. & S. Bk.* v. *Commissioner*, 63 F. 2d 619 (C.A. 5, 1933), affirming 22 B.T.A. 541 (1931).

In 1942 petitioner advanced the net amount of $14,596.43 to Ozaukee to pay a personal holding company surtax liability. Petitioner contends that this sum should be added to the capital loss which it reported for 1941, or, in the alternative, that it is deductible in 1942 under section 23. The need for petitioner to make the advance arose directly from its position as sole stockholder and liquidating distributee of Ozaukee. The loss resulting from the advance is, therefore, treated the same as the other losses growing out of the liquidation and is nondeductible under the provisions of section 112(b)(6). See *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952).

Petitioner also asserts that the sum of $25,508.17, allegedly representing amounts determined by respondent as distributions to shareholders in settling Ozaukee's personal holding company surtax liability, should be added to the loss claimed in 1941. There is absolutely no evidence which would warrant consideration of this figure when computing petitioner's gain or loss on the Ozaukee liquidation. It must, therefore, be disregarded.

*Decision will be entered under Rule 50.*